Mr. Hawkins, Mr. Petroff, I'm Judge Dennis, Judge Higginson, and Judge Costin, we're on the panel. We're having a little trouble with our system here, okay, I think we've worked it out. This is Brotherhood of Locomotive Engineers and Training v. Union Pacific Railroad Company. We'll hear first from Mr. Hawkins. Mr. Hawkins. Thank you, Your Honor. May it please the Court, my name is Robert Hawkins, I represent the appellant, Union Pacific Railroad Company. Union Pacific asks the Court to vacate the injunction issued by the District Court and to remand the case with instructions to dismiss the case for lack of subject matter jurisdiction. This case involves a dispute over potential employee discipline under the Railway Labor Act. Under the RLA, disputes concerning employee are known as minor disputes, as the Seventh Circuit has stated, a quintessential minor dispute. No party challenges that concept on appeal. Under the Railway Labor Act, Congress gave exclusive jurisdiction over minor disputes to the National Railroad Adjustment Board or to an arbitration panel of parallel jurisdiction established by the parties. This Court, in line with every other circuit, has held repeatedly that the only exception to the exclusive jurisdiction of the NRAB exists when necessary to protect the jurisdiction of the arbitration panel created by Congress. Only where there is irreparable injury of such magnitude that would render a decision on the merits virtually meaningless and consequently also deprive the grievance procedure of jurisdiction is their federal subject matter jurisdiction. As this Court recently stated in the BNSF Railway case, a court's jurisdiction in a labor dispute is limited to preserving and enforcing the RLA's dispute resolution procedures. And as the Court said in the Flight Attendant's case against American Airlines, generally speaking the exceptions to the limits on federal judicial power in minor disputes arise only when the administrative mechanism that Congress confected breaks down. If the administrative process is available, minor disputes must be resolved, must be routed through it. That's the Southwest Airlines case. That's all kinds of... Does that have anything to do with the employee animus rule, which I think is very large in this case? Yes. I'm sorry if I couldn't hear you, but it seemed to me like you were reading some matter that really doesn't pertain to the crucial issue in this case. Your Honor, many of the courts that address the exceptions to the Railway Labor Act mandatory jurisdiction for the NRAB recite a three-part test. The courts look to whether there has been proof of anti-union animus, whether there has been evidence that the acts of intimidation cannot be remedied by administrative means. But in every single case after TWA, the Supreme Court case in TWA, the courts then immediately go on to explain that federal court's subject matter jurisdiction is limited to cases where the mandatory Railway Labor Act dispute procedures are unavailable or where the disputes procedures mandated by Congress have, in this court's words, in the American Airlines case, broken down. In no case after TWA has any federal court intervened in any employee discipline matter where the grievance arbitration procedure remains available to the employee or his or her union. Mr. Hawkins, the case you put emphasis on in the reply brief, the Second Circuit Amtrak decision, you're familiar with that? Yes. I often refer to that as the Carmen Familare decision. Yes, Your Honor. That itself is explicit that where it is clear that the employer's conduct has been motivated by anti-union animus, then courts can bypass the mandatory arbitration process. Go ahead, sorry, Your Honor. To me, this comes down to if you had persuaded the district court that this is a who struck John case, it's just a fist fight, and of course, people have to be disciplined. Then you'd be right. It's on its way to the arbitrators and federal courts stay out. But here, the district court had a lot of evidence presented to it to disbelieve that and say that this discipline is a sham and the purpose was union busting, that your client wanted to knock out the leadership of the division. And so then to me, it reduces, well, is there substantial proof to support the pretext? And then your argument would have to be that the district court clearly erred. What's wrong with that way of looking at? Yes. Yes, Your Honor. Going back to the major premise here of what does the union need to prove to establish an exception to what Congress created here, which is the mandatory minor disputes process. The courts have been very clear, including the Second Circuit in the Familare case, where the employee was disciplined for activities in connection with representing a member during the grievance process. These are core union activities. And if these were NLRA cases and a mere allegation or mere circumstantial proof of discriminatory animus or anti-union animus were enough to get past the exceptions, all of the cases cited in our brief would have been decided differently. That's just not the law. The unions in these cases must prove not only that there is anti-union animus. That is a necessary, but not a sufficient component of their claim. For the courts to have federal subject matter jurisdiction, much more needs to be proven. And every single case cited in our brief says so. In the Familare case- Why isn't it tied to the statute? Because it seems to me this all comes back to the statute and for a few of these statutes the case law says they require court enforcement. And so part third of the statute says the company can't undermine union representation. So why isn't it that when there's anti-union animus that could potentially undermine leadership, that that's what the courts are saying is an exception to the normal route of arbitration? Yes, Your Honor, that's exactly what the courts have not been saying. What they're saying is that anti-union animus or discriminatory animus is necessary. But then to comply with the disputes procedures that were created by Congress in 1934, the courts need to respect those disputes procedures and allow them to be processed through the minor dispute process of the act. That's true where the underlying activity of the employee is what we would call core union activity. So you're saying courts don't have a role to enforce the third, which is the company can't coerce or undermine the designation of representative by the either side, actually, the union can't do it to the company either. But in this context, the company can't interfere and undermine the union's choice of representation. Going back to your- that goes back to two third and two fourth of the act, which I would urge the court to do. Well, that's what I asked you about, I said when the anti-union animus is tied to a violation of the third, this terminology is so weird, but the third. And so that anti-union animus undermines the leadership choice by the members, that that is where courts can step in because they're enforcing a statute. And it's not for just a matter for arbitration. I'm asking if that's a reading of- you do recognize, it seems to me, an anti-union animus exception. There's just disagreement over what else you have to prove to have court jurisdiction for a case involving anti-union animus. So what I'm asking is when it's tied to conduct that undermines the representation choices, is that enough? Your Honor, the answer is no. If you go back to the TWA decision, two third and two fourth of the act guarantee that the employees have the right to select their bargaining representative. At that point, Congress stops. Two third and two fourth allow the employees to select their union, period, end of story. It does not go on as the National Labor Relations Act does to establish a generalized code of conduct that applies post-certification. In the post-certification environment, Congress carefully looked at this in 1934. And they gave exclusive jurisdiction to the National Railroad Adjustment Board to handle post-certification disputes other than those involving collective bargaining. Even where it involves firing the leadership. So the next time collective bargaining comes around, these agreements don't last eternally. They expire and get renegotiated. You fire leadership. You're saying it's still- that's just still a matter for arbitration, even though it directly strikes at the third in the statute. Again, the employees have the right to select their bargaining representative. And that is where Congress stops in the Railway Labor Act. In the National Labor Relations Act, it is a different story. Remember that the National Labor Relations Act was passed in 1935, just one year after the amendments to the RLA. In 1934, Congress expressly gave to the National Railroad Adjustment Board exclusive jurisdiction to handle post-certification disputes. One year later, it established in the National Labor Relations Act a generalized code of section 7 of the act that said employees have the right to engage in all sorts of behavior for mutual aid and protection. It established a rule that you can't interfere with the union in a post-certification environment. It established the National Labor Relations Board to adjudicate claims of unfair labor practices. It did none of that to the statute that they amended just one year earlier. I'm just confused, and I know you know this area of law, but is your argument that the there's no animus exception in the post-certification minor dispute context? None. Even when the employer's actual purpose is to interfere with the union itself? Or is your position that, yes, there could be a special circumstance where courts can intervene, but not when the purpose was only to deprive them of the representation of these six or five individuals? Or are you saying that, yes, there could be intervention, even as to that level of interference with a choice of one's representative, but here the district court clearly erred, finding that that was the proof, because it wasn't? Which of those is your primary argument? Your Honor, first of all, the primary error of the district court is legal. Under the RLA, post-certification relief is limited to anti-union circumstances where the employer is trying to undermine the collective bargaining representative. Okay, but why isn't that what the district court found here? That Union Pacific was trying to undermine by eliminating the persons that were representing Division 172? The collective bargaining representative, Your Honor, is not 172. It is the Brotherhood of Locomotive Engineers that represents 5,000 workers on a system-wide basis. Under the Railway Labor Act, collective bargaining units are not certified on a location-by-location basis. This is not like the NLRA, where you can have the fragrance counter at Macy's organized as a separate union. That doesn't work under the NLRA. You have system-wide representation. For the carrier to undermine the BLET, it needs to undermine the BLET on a system-wide basis. Furthermore, in this particular case, when you're talking about the local, the carrier suspended employees from their activities as Union Pacific engineers. It didn't suspend them from their activities as union representatives. The local in this case, or the division as they call it, has very limited activities. They file grievances. They represent workers in disciplinary hearings, and that's it. They're not even allowed to progress an appeal of discipline if it's ever assessed. I guess what seemed most incongruous to me was especially the discredited testimony of Cisneros, because ultimately the district court does conclude by not admitting in his statement or writing that he'd hit first, he discredits him. But even Cisneros, discredited, admitted that the four bystanders did nothing. So what's the 1.6 charge based on, that they didn't physically intervene, or I couldn't understand why they were suspended and statements were taken even based on Cisneros' discredited testimony. Rule 1.6 is a conduct unbecoming rule, and it applies to off-duty misconduct. You saw a lot in the briefs about what was the conduct unbecoming. As to those employees, first of all, they did not try to break up the fight. One employee did. No, that's not true. Butler said that they did, verbally. No, I don't believe that's the record, Your Honor. There is one employee who did break up the fight, and he was not disciplined. As to the remaining four, I believe the record is that they did not try to break up the fight. But again, Your Honor, those are the issues that have to come out in an investigation. For the factual basis of this case, Union Pacific's record stops when those notices of investigation go out. At that point, the process is collectively bargained. The union and the company have an agreement as to how discipline matters are supposed to occur. In the discipline case, the employee is entitled to a fair notice of the charges against him. He's entitled to have representation by the union at a hearing. He's entitled to a fair and impartial investigation, and if he's ever found to be wrongfully suspended or wrongfully charged, he gets full back pay and reinstatement, make whole relief. And there are appeals processes following the investigation that have never happened here. Well, just back on the evidence that was presented, what would you point to in the record as any justification for the suspension of those four? What in the record that was presented was asserted by Union Pacific? Well, first of all, Your Honor, the record is not developed yet. No, I know. I'm just asking you, where was any justification offered? The justification was that these employees were employees who were visiting, watching the fight. They did nothing to intervene. What happened here was a clear violation of what an employer has a right to expect of its employees. This employee reported that he was beaten up and threatened, and we won't get into the threats because that's not an issue before the court. But the employee reported that he was threatened and beaten up because he complied with the employer's requirements. Your time has expired. Thank you, sir. I think I have time on rebuttal, Mr. Petroff. Yes, Your Honor. Your time is running. Good afternoon. My name is James Petroff from the law firm of Barkin-Meisler, appearing today for the Appellee Brotherhood of Locomotive Engineers and Trainmen, or I'll refer to them as the BLA team. I think in this case, as you see, I don't think it gets any worse than this. Like let me explain. So we have a selective discipline based on union activity and to weaken the union, and the company has fired all the local division for an off-duty altercation at a union meeting. I would like to contrast that with the case that's cited by Appellate Boston and Maine, which is a First Circuit case in 1986. There you had the termination of 725 strikers, and then the employer in that case argued that it had the right to lay off under the CBA, therefore it was a minor dispute. And the court in very, very strong language said this was a transparent statutory violation of Section 2, 3rd, and 2, 4th. Now the reason why I mentioned Boston and Maine, not only to show how bad it can get when these things happen, but you would think the termination of all union supporters would be devastating to the union, and it is. But you still can internally organize. If you lose all your supporters, if there's still people that are disaffected, you could go person to person and talk to them and try to get them to understand why they need a contract. And the new hires, don't forget, that railroad once upon a time wasn't organized at all, there were no union supporters. But who are the people every day that do that type of internal organizing at the workplace? It's these leaders that are watching today that got wrongfully terminated on the basis of anti-union animus. But I mean, just because they're leaders doesn't mean that they can send death threats in three on one, whether he ended up getting the better of them. It was an off-duty brawl. That really does sound like grist for an arbitrator. The railroad isn't saying it won't be adjudicated, it's just this isn't existential to the collective bargaining process. That's what I hear him saying. And whether that's an argument of clear errors to facts or whether that's a very, you know, the Hari Kari substantial limitation in the post-certification context of letting federal courts mix up as to little discipline matters. Yes, Judge, you know, he's obviously arguing that this is a minor dispute and normally you would have a minor dispute, but the facts that you pointed out to, that we've pointed out to, shows that this is a statutory violation, just like in Boston and Maine, and just like in Central Georgia Railway case in 1962. And as noted by, and so this here, you know, in the Railway Crime Case, which is in 1990, this Fifth Circuit said, there are two exceptions to the minor dispute doctrine. One is when there's no arbitration available, no adjustment board. Number two is when you have anti-union animus, a decision, an action based on anti-union animus to weaken or destroy the union, and they cited Central Georgia Railway. That's after the TWA versus IFA Supreme Court opinion. And so you have that here, which is clearly the law all over the jurisdictions in the United States post-certification. If you show anti-union animus, and it's got to be clear, it has to be clear in the context of a TRO, don't forget what you're going to do, you have declarations up front, then you have to prove it right there. If you cannot prove this as a anti-union animus case, then you're not going to get it. It's going to go back to the motion to dismiss from the company. What's the limiting principle to make sure that it doesn't sort of just immunize union leaders at this local level? Well, I mean, there is no immunity for local union leaders. I agree with Bob Hawkins on that. Absolutely. You are subject to the disciplinary process, but you're not subject, you're protected from discrimination. And this, you know, here, they've made the argument here that the floodgates would open if you follow Central Georgia Railway and Railway Carmen from 1962 and 1990. There is really no, how many cases have there been in the Fifth Circuit like this since 1962? Almost six years. Zero. None. OK. And if you take their position, which allows the company, contrary to the express terms of the statute, as Judge Costa said, you know, to undermine the union, it'll create a moral hazard. And the floodgates will happen where we have Boston and Maine again, where you have all the local union leaders terminated for off-duty misconduct for what's set at a union meeting. So the system-wide impact you're saying is at a local level, if you decapitate them, it will have systematic impact. Yeah, so I think, you know, first off, the industry brief here from the amicus and also Bob Hawkins here is saying that if you're just, you know, you have to prove that we are just destroying the union. And there's no federal case that has ever said that. It's a ludicrous proposition. All you have to prove is that you have a clear case of anti-union animus. Let me give you an example. But it does seem under the statute it has to affect the representation choice. And so I read him as saying it can't do that here because the negotiation is really done at the national level. These local leaders don't have a big say in that. They're not even prevented from continuing to participate in that to the extent they do have a role. What's your response to that? I think that, you know, it's obvious that this type of situation where you attack the union at a local division level, you know, at a system-wide level, the BLET is the exclusive representative. Then it has all these local unions around the country to represent people. If you attack and destroy the El Paso membership, it affects the entire country. When you cut the head off the union, the leadership that people have elected, like these guys, OK, it has a chilling effect on everybody in the country. There's no question. If you can't protect those guys, the leadership, how do you think you're going to protect me? Why am I going to file grievance and stick my neck out against a company that can do this? So this absolutely weakens the union. Under the National Labor Relations Act, Your Honor, the NLRB has a 10-J injunction for behavior like this. Absolutely. And so when you think about it, these Section 2-3rd and 2-4th violations, I want to put them in context. Under the Railway Labor Act, they're criminal offenses. 45 U.S.C. Section 152-10th, you get 60 days in jail and up to $20,000 fine. So Congress chose, rather than under the National Labor Relations Act, 883, where that's not the case, to make this a criminal offense to have anti-union animus against employees in the union. They did that because, I believe, the history of the railroads taking this type of action. There's a reason why they did that. And Congress, in 1934, added these fundamental protections for employees in the unions to be free from discrimination and this type of criminal behavior. Now, in Central Georgia Railway, that this court decided in 1962, there's no reason to depart from that decision. There, a union leader was fired for telling people not to settle their injury claims against the railroad. The company's defense was, we had a legitimate reason to discipline. He's not loyal to the company. And this is costing us money. Less people are settling. But it was worth it. Well, I was going to say, it is unusual that an author of an opinion would go sit elsewhere and then drop a footnote questioning his own authority. Yeah, well, Judge Brown, and God rest his soul, he passed away, I think, the next year. And he's sitting out there. And I think that decision really has a lot of selective citation to that. I mean, that's really not necessary to his decision in the 1990 Amtrak decision. And don't forget the facts, Your Honor, in that case. Those two union leaders had an unlawful strike. They went to arbitration over that discipline for getting fired. And they were found to have an unlawful strike, calling a wildcat strike. So in that situation, there was a transparent violation of the law and the employer policies by the union officials. There was no transparent violation of Section 2-3 and 2-4 by the company. And again, as you go back to the idea, if you have, if you're able to show that this was motivated by anti-union animus to weaken the union, like Judge Brony's file, okay, that's your ticket to getting into federal court. That's what Congress wanted to do for this type of horrendous offense. Well, you are Mr. Hawkins, and it helps me because you all know the record better. But he corrected me. I had thought that Butler, when he testified, did say that one of the suspended bystanders had verbally said, hey, whatever their names were, Shepard, Cisneros, and the other guy, stop it. But I put Cisneros aside because by the end, he's not credited at all. But even he said that the bystanders had done nothing. So I really don't understand Union Pacific's behavior towards the bystanders. Oh, I know. So Judge Brony said, I don't find any credibility in this David Cisneros, this guy. So the only evidence that we have in the record on that, I'm not the only evidence, but the uncontroverted evidence is from Kevin Seale, one of the suspended guys. Okay. And on his declaration, which we both stipulated to into evidence, the company, he said, David, and this is Union Exhibit 4, David Cisneros walked to Jose Reyes, which was the union official. Jose Reyes said, words to the effect, David Cisneros, they would speak during the membership meeting. David Cisneros replied with words to the effect, he was done speaking. David Cisneros began punching Jose Reyes. I, meaning Kevin Seale, along with Joseph Telaney, a union supporter, Pete Shepard, and John Moy attempted to separate David Cisneros from Jose Reyes. Jose Reyes had fallen and struck his head on the parking lot pavement because of the punches of David Cisneros. When I viewed Jose Reyes as he was lying on the pavement, his eyes rolled back into his eye sockets. Peter Shepard and Joseph Telaney stood behind David Cisneros and Jose Reyes. John Moy, another suspended individual, and I assisted Jose Reyes to his feet. Jose Reyes was cleaning blood from his face and scalp and also removed a pebble from the parking lot from the back of his scalp. Jose Reyes was on his feet and David Cisneros began punching him again. I separated David Cisneros from Jose Reyes, along with a member, Jason Barnett. Jason Barnett had arrived during the first altercation. So, you know, that's the uncontroverted evidence in this case. If you do not believe the, you know, the performance. The last question on the evidence. Why was the video never introduced into the record? Is that clear? Yeah. So, I mean, unfortunately, the court system did not work. It just got out of the blue, out of the blue. But we tried to get some of the aspects of it in, but really we couldn't. So the judge here, don't forget in this case to actually like the case in, like the case in Central Georgia Railway in 1962. The company has said that for those bystanders, you are liable for not reporting this misconduct. Okay. Now, Jason Barnett, another bystander who was supportive of David Cisneros. It didn't charge him with that. He didn't report it. They didn't do that to Mark Friere, who was there, a bystander. No, they just did it against the union members. They took the supporting people that supported David Cisneros. They took statements from them and put them in the record. Right. But they never took statements from our guys. Okay. And over the course of time too, don't forget. They saw this video of what happened. They heard the testimony of David Cisneros in court and how absolutely incredible it was. They're still doing this. They're resting on this anti-union discrimination to wipe out local division 192. The court absolutely found that the company was trying to weaken and use this as a hammer against the local division. Just think in this context. Now, in the Central Georgia Railway case, you had one union leader who clearly was, the company was trying to say he was disloyal for just simply representing a member. And what happened was they said, that's a violation of section two, third and two, fourth. This is five times worse than that because we have almost our whole union leadership, all the officers and the trustees taken out. Now, the whole idea of section two, third and two, fourth is where they don't get to de-select the representative. They don't like them. They don't like what they did. They don't get to de-select them. Now, if we have a union leader, let's assume a direct evidence case. Okay. It makes it even clearer, I think. So say a union president is fired for chewing gum. And we have direct evidence from the company that says, an email from the president of the company. And he says, this guy's way too militant. I know he's just chewing gum, but we got to fire him because it's going to weaken the union. Nobody's going to file any grievances and we'll make $100,000 extra a month and we'll all give ourselves raises. Okay. So that was the intent. It's clear. Under Mr. Hawkins proffered standard, as well as the industry standard, as long as arbitration is available in that direct evidence case, as long as it's available, then you are precluded from getting an injunction in federal court for that. Let's say the guy wins. He wins bad pay. Okay. He's the selected representative by the membership. Let's say that the company says, well, you know what? We're not going to reinstate him. We're going to fire him because we think that he fraudulently testified in that first arbitration. And the company serially does this each time. There's direct evidence each time that they are discriminating on the basis of anti-union animus because they're making more money and they're quashing the local union. Under his scenario, you could never get an injunction in federal court. Under the industry's scenario, you could never get an injunction in federal court. And I submit that that's a preposterous position that no court has ever taken. When you talk about what has occurred here, the company brief here really cherry picks some of the language from other court decisions. They rely on Amtrak in 1990 from Judge Brown. Again, those were individuals who were found to be guilty of committing offenses. And so these are just bad cases for the union. Factually, in UTU versus Amtrak, which is the second circuit decision they rely on, the union leader in that case bribed a witness. Okay. Now, where's the anti-union animus of that? They just make a claim. There's none. And even in the BNSF case, the border league in Northern case in the ninth circuit, the union leader was literally harassing employees about working overtime. He wanted it for himself. They made a general claim here about that it was somehow discriminatory against the union grievance process. But none of that bore any out. Those are just bad cases. There's been nobody that has adopted this idea, creating a moral hazard to undermine the union. So think about Boston and Maine, where we started. Okay. In that situation where the injunction was granted, laying off a 725 workers who were strikers engaging in union activity, protected union activity. Today, under their standard, under Mr. Hawkins' standard, what would happen is you would say, well, you know, we really didn't destroy the union in that setting. We really didn't destroy it. You could still organize some of those people, maybe, whatever. You could also pass benefit rules or work rule changes that exclude union membership. You know, I have a pension plan. I'm going to say that no union members from now on are able to join the pension plan. And so therefore, which actually happened in the Atlas airline case, by the way, but then little by little, as you go on, the union membership is dwindling. There would be no arbitrator ever that could overturn that pension plan. Okay. It might be a minor dispute whether the company could make the change, but who's going to grant an injunction like an Atlas airlines to overturn that unlawful provision that says pension plan is not available for union members. You could have other types of things of a withdrawal, setting up a rival company union, even though this is what section two third and two fourth was designed to stop. And for all new hires, we're not going to recognize the VLAT. We're going to recognize this company union where we select the representative. So in this case, your honor, what the clear that all they're really what it comes down to is the challenging the factual evidence. And, you know, they've tried to proffer a really crazy standard that nobody's agreed to, to, to win here, but they're really just going after factual evidence. And as you know, this court has, it doesn't sit there and see the credibility of David Cisneros or anybody else. So you're not in a position to, to rule on that. We asked for the firm. Thank you. Your time is expired.  You're muted. Thank you, your honor. Going back to the minor dispute, Congress created mandatory and exclusive procedures one year before the national labor relations act one year before all of the NLRA precedent that Mr. Petrov just mentioned and decided not to change the railway labor act that it amended and created mandatory and exclusive disputes procedures. Just one year before there are very narrow exceptions to that rule. That rule requires not only that there be anti-union animus, but also that it affect the collective bargaining representative. There is no evidence that the BLET that has represented union Pacific's engineers on a system wide basis for over a century is in any way threatened by a disciplinary dispute involving five employees in El Paso. Even as to the local in El Paso, the record is abundantly clear undisputed that the employees there have the right to continue filing grievances. They have the right to continue representing members in the disciplinary process. In fact, the disciplinary notices in this very case told the employees to show up for a disciplinary hearing at the holiday inn, not even on the property. There was a lot of discussion about the evidence that came out at the preliminary injunction hearing. Bear in mind, your honors, none of that evidence was available to the union Pacific because the union stopped the hearing from going forward. There was an agreement by the parties that this hearing would resume in July of 2021. The union then went to court to stop it. Union Pacific never got a chance to have the investigation at which people could present evidence, cross examine witnesses and present their own side of the story. It never happened because the union stopped it. On your core legal point that more than animus has to be shown, it actually has to be existential to the union system-wide. That's not sort of TWA or Andrews. What's your best circuit that would tell courts when the threat to the union, even if it would be a very chilling one as to the El Paso local, is not existential to the 6,000 members of BLET? Where's the best circuit description of that as a requirement? Second circuit in the Famulari case, otherwise known as United Transportation Union versus Amtrak, Judge Brown's decision in the first circuit and the subsequent decision in the Starr-Hess case in the second circuit. I forget exactly the names of the official parties, but that was the woman who reported safety violations to the FAA. In every one of those cases, Your Honors, the same claim can be made that is made here, which is that if you penalize someone for filing a grievance, for starting a strike or for reporting things to the FAA, that may chill the employees from doing other things. We then listen for at least 10 minutes from Mr. Petra about issues that are not even in this case, whether the company is trying to knock off the head of the union. The Union Pacific didn't go after the head of the BLET. It addressed disciplinary matters involving four employees at a local union. That has nothing to do with what you have here. Well, he was responding to a fact-specific question of mine when he cited that. It is important, Your Honor, that Union Pacific's case here dovetails with the jurisdictional test for injunctive relief under the Norris-LaGuardia Act. As this court recently ruled in the BNSF case, the courts accommodate the anti-injunction commands of the Norris-LaGuardia Act only to protect the viability of the arbitration procedures that are established by Congress. As this court said in the BNSF case, a court's jurisdiction in a labor dispute is limited to preserving and enforcing the RLA's dispute resolution procedures. What the union is trying to do here is to use various bits of circumstantial evidence that might come in in an EEO case, that might come in in an unfair labor practice case to say, well, what was the company's true motive in doing what was done here? Well, let's look at it. The union says, well, it didn't discipline some employees who were also there, or it disciplined some employees who didn't actually participate in the fight, but of course they didn't report it. Those employees violated their duty to the company because they didn't report a clear instance of harassment. For example, Your Honor, if any of the Union Pacific employees witnessed sexual harassment off the job and failed to report it, there would be no question before these courts that that was misconduct. In this situation, you had an employee who was retaliated against because he complied with the employer's directives. That's intolerable. It's absolutely intolerable. And what happened was the company properly issued notices of investigation and then got stopped by the union's injunction. I think I've run out of my time. I appreciate your attention. Thank you, sir. That concludes our cases for oral argument today. Well, judge against.